**In the Matter of Kristan PETERS, Respondent.**

No. M–2–238.

United States District Court, S.D. New York.

April 10, 2008.

Marc L. Mukasey, Bracewell & Giuliani, New York City, for Respondent.

## OPINION AND ORDER

RAKOFF, District Judge, for the Committee on Grievances.

This matter comes before the Committee on Grievances for the Southern District of New York (the "Committee") to consider the imposition of discipline against respondent Kristan Peters based upon the proceedings (collectively, the "Wolters Kluwer proceedings") before the Hon. Harold Baer, United States District Judge, Southern District of New York, described in Judge Baer's opinions in *Wolters Kluwer Financial Services, Inc. v. Scivantage*, 2007 WL 1098714 (S.D.N.Y. Apr.12, 2007)("*Wolters Kluwer I*"); *Wolters Kluwer Financial Services, Inc. v. Scivantage*, 2007 WL 1498114 (S.D.N.Y. May 23, 2007)("*Wolters Kluwer II*"); and *Wolters Kluwer Financial Services, Inc. v. Scivantage*, 525 F.Supp.2d 448 (S.D.N.Y.2007)("*Wolters Kluwer III*"). Full familiarity with these opinions is here assumed.

The Wolters Kluwer proceedings, involving alleged infringement of trade secrets and the like, began on March 21, 2007, with an application by Ms. Peters, then a partner at Dorsey & Whitney LLP ("Dorsey"), counsel for plaintiff, for a Temporary Restraining Order and emergency discovery. 525 F.Supp.2d at 455. The case was assigned to Judge Baer. Over the next few weeks, there was a rash of activity in the case, culminating, on April 13, 2007, in plaintiff's voluntary dismissal of the action in the Southern District of New York and plaintiff's filing of a similar action in federal court in Massachusetts. *Id.* at 495–98. This did not end the activity relating to Judge Baer's prior orders, however, which continued for some days and ultimately led the defendants in the Wolters Kluwer proceedings to move before Judge Baer, on April 24, 2007, for sanctions pursuant to Fed.R.Civ.P. 37, Fed. R.Civ.P. 16(f), 28 U.S.C. § 1927 and the inherent powers of the court, and for civil contempt against Peters, among others (the "Sanctions Motion"). Ms. Peters was lead counsel for Wolters Kluwer in the litigation generally and, in particular, in connection with the events giving rise to the Sanctions Motion. 525 F.Supp.2d at 451, 509.

Judge Baer conducted five days of hearings over a period of two months on the Sanctions Motion. Sixteen witnesses testified, and over one-hundred exhibits were received. Ms. Peters, who was represented at various times during the proceedings by Michael Ross, Esq., Pery Krinsky, Esq., Robert Katzberg, Esq., and Charles Stillman, Esq., testified at length: her testimony spans over 160 pages of the transcript. Ms. Peters also actively participated pro se during the proceedings, conducting voir dire, offering documents, making objections, and cross-examining witnesses. *See, e.g.*, Tr. 7/23/2007 at 58–80, 104–121, 123–125; Tr. 8/15/2007 at 49–108, 127–146, 149–151, 167–98; Tr. 9/4/2007 at 20–34, 53–71, 118–149, 168–174, and 238–80.[1] Judge Baer also granted Ms. Peters' requests, over

---

1. "Tr." refers to the transcript of the hearings on the Sanctions Motion.

defendants' objections, to examine witnesses out-of-order and to call witnesses who were not on any witness list. 525 F.Supp.2d at 535, 536 n. 326.

At the conclusion of the hearings, the Court issued a 109–page opinion imposing more than twenty-four separate reprimands or sanctions on Ms. Peters, grounded on 28 U.S.C. § 1927, the inherent powers of the Court, and Fed.R.Civ.P. 37 and 16(f). The legal standard for imposing such reprimands and sanctions is "clear and convincing evidence." *See, e.g., Capital Bridge Co., Ltd. v. IVL Techs. Ltd.,* No. 04–CV–4002, 2007 WL 3168327, *8 (S.D.N.Y. Oct. 26, 2007) (to impose sanctions under § 1927 or the inherent power of the courts, there must be a finding of misconduct "by clear and convincing evidence"); *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 439–40 (S.D.N.Y.2002) (sanctions based on the court's inherent power must be based on "clear and convincing evidence").

In his Amended Opinion and Order dated November 30, 2007, Judge Baer referred the matter to this Committee. 525 F.Supp.2d at 550.[2]

By Order dated December 10, 2007, the Committee designated Barbara S. Gillers, Esq., a member of the panel of attorneys appointed to advise and assist the Committee pursuant to Rule 1.5(a) of the Local Civil Rules of the Southern District of New York, to investigate the matter as necessary and prepare such statement of charges as the Committee deemed warranted. Thereafter, by Order To Show Cause dated January 30, 2008, the Committee directed Ms. Peters, pursuant to S.D.N.Y. Local Civil Rules 1.5(b)(5) and (d)(4), to show cause why the Court should

not discipline her and, in the interim, suspend her temporarily from practicing before this Court. The Order alleged that Ms. Peters had violated the New York Code of Professional Responsibility, 22 NYCRR § 1200.1 *et seq.,* by, *inter alia:* (i) engaging in conduct involving fraud, dishonesty, deceit or misrepresentation, in violation of DR 1–102(A)(4); (ii) knowingly making a false statement of fact or law, in violation of DR 7–102(A)(5); (iii) engaging in conduct prejudicial to the administration of justice, in violation of DR 1–102(A)(5); and, (iv) disregarding the ruling of a tribunal made in the course of a proceeding, in violation of DR 7–106(A). The bases for these violations were Ms. Peters' misconduct in (1) instructing an associate in her firm to alter or amend documents for the purpose of preventing their discoverability and then attempting to mislead the Court as to these events; (2) participating in a conference with the Court to adjourn a TRO hearing and discuss future depositions at a time when the respondent knew that those depositions and the TRO hearing would not take place; and (3) copying transcripts and ordering additional copies of transcripts in intentional disregard of court orders, and then using the transcripts in an action in Massachusetts in violation of the Court's Confidentiality Order. The Committee directed respondent to file a personal affidavit as to the facts and a memorandum of counsel as to the law within 20 days. However, respondent's time to file papers was thereafter extended, at her request, to February 27, 2008.

On February 27, 2008, respondent, represented by Mark Mukasey, Esq., of Bracewell & Guiliani (now replaced by her

---

**2.** While Judge Baer also referred the matter to the State disciplinary authorities, those authorities subsequently informed this Committee that, in order to conserve resources and avoid parallel investigations, they would await this Committee's actions before taking up the matter.

current counsel, Richard Maltz, Esq.), filed a 62–page declaration and a 36–page memo of law. These submissions disputed the aforementioned charges on the merits and also asserted that the proceedings before Judge Baer were improper, unfair, biased and lacking in due process. The papers also argued that, because these various contentions were or would be presented to the Second Circuit on Ms. Peters' appeals from Judge Baer's decisions, the Committee should defer making any final determinations until the appeals were completed.[3] Finally, respondent argued that any interim suspension would subject her to undue hardship.

The full Committee (consisting of Chief Judge Wood, Judges Castel, Haight, Keenan, Lynch, McMahon, Stanton, Magistrate Judge Freeman, and the undersigned as Chair) has now reviewed Ms. Peters' lengthy submissions, as well as the record before Judge Baer. After careful deliberation, the Committee is unanimously of the view that Judge Baer's findings are strongly supported by the record and that the proceedings afforded Ms. Peters ample due process.

█ The preliminary remedy of an interim suspension is available in such instances to protect the public from future disciplinary violations of the respondent during the pendency of proceedings before this Committee. Considering the nature and seriousness of the charges against Ms. Peters, the strength of the record supporting those charges, and the danger of recurrence as demonstrated by respondent's

lack of appreciation of the wrongfulness of her misconduct, the Committee concludes that an interim suspension of respondent from the practice of law before this Court pending final adjudication of the charges against her is warranted. In the exercise of its discretion, the Committee will defer the final adjudication of the charges against respondent pending before this Committee until her appeal of Judge Baer's Amended Opinion and Order dated November 30, 2007 is decided.

The interim suspension of respondent would be warranted on the basis of Judge Baer's findings alone. Such findings are commonly given preclusive effect in subsequent disciplinary proceedings. In particular, this is settled law in New York, whose disciplinary code (though not necessarily its law of collateral estoppel) is applied in the Southern District of New York. *See, e.g., In re Abady*, 22 A.D.3d 71, 77–78, 81, 800 N.Y.S.2d 651 (1st Dep't 2005) (noting that the New York "Court of Appeals and numerous appellate courts in [New York] have upheld the use of collateral estoppel in [disciplinary] proceedings" and barring a lawyer from re-litigating before the disciplinary committee whether he had violated, *inter alia*, DR 1–102(a)(4), DR 1–102(a)(5) and DR 7–106(a) on the basis of findings that led to sanctions by the New York Supreme Court) (citations omitted); *In re Osborne*, 1 A.D.3d 31, 32, 766 N.Y.S.2d 33 (1st Dep't 2003) (applying collateral estoppel to discipline a lawyer "based on the findings made in three unrelated civil cases in which monetary sanc-

---

**3.** Ms. Peters has taken appeals from *Wolters II and III.* The Second Circuit has consolidated those appeals and has already extended the briefing schedule twice. By scheduling order dated January 18, 2008, her brief was originally to be filed on or before February 22, 2008. By order dated February 4, 2008, reciting that "appellants [had] requested a modification of the scheduling order," the Second

Circuit extended the filing deadline to April 4, 2008. By further order dated March 20, 2008, the Second Circuit (i) granted Mr. Mukasey's motion for leave to withdraw as counsel on the appeal (where he had also represented Ms. Peters); (ii) gave Ms. Peters 30 days to appear pro se or have new counsel file a notice of appearance; and, (iii) extended the filing deadline to May 5, 2008.

tions were imposed on [the lawyer] for pre-trial misconduct that exhibited disdain for the court," including one case decided by Southern District Magistrate Peck); *In re Morrissey*, 217 A.D.2d 74, 75, 79, 634 N.Y.S.2d 51 (1st Dep't 1995) (applying the doctrine of collateral estoppel to facts found by the Southern District in a civil case).

■ Moreover, even if collateral estoppel were inapplicable here, this Committee routinely accords substantial deference to the factual findings of the court that heard the evidence, for much the same reasons that an appellate court gives such deference, i.e., that the court that hears the evidence is in the best position to assess credibility. *See, e.g., United States v. Carlton*, 442 F.3d 802, 811 (2d Cir.2006) ("We accord strong deference to a district court's credibility determinations, particularly where that court based its findings on such determinations."); *United States v. Mendez*, 315 F.3d 132, 135 (2d Cir.2002) ("[w]here the district court's factual findings are premised upon credibility determinations, we grant particularly strong deference to those findings") (citations omitted).

But even if all this were disregarded, the record before us amply demonstrates that at least some of the charges against Ms. Peters are so strongly supported as to warrant interim suspension on any analysis. Consider the following facts, which are (except where otherwise noted) substantially undisputed:

As noted, on Friday, April 13, 2007, the plaintiff, counseled by Ms. Peters, voluntarily dismissed the Wolters Kluwer action in the Southern District of New York pursuant to Fed.R.Civ.P. 41(a)(1)(ii) and filed a new action in the United States District Court for Massachusetts, *Wolters Kluwer Financial Services Inc. v. Scivantage*, No. 07–cv–10729, 2007 WL 1098714 (D. Mass.,

filed April 13, 2007)(the "Massachusetts action"). 525 F.Supp.2d at 497; *see also Wolters Kluwer III*, 2007 WL 1498114 at *2. The complaint in the Massachusetts action was not served on the defendants immediately and the notice of the voluntary dismissal was served by United States mail. 525 F.Supp.2d at 496–97. That same day, unaware of the dismissal and the filing of the new action, defendants, in response to the plaintiff's prior discovery demands in the action before Judge Baer, produced "a) electronic copies of the approximately 54,774 pages [previously] provided on April 11 in paper form, in response to Ms. Peters' further demands, and b) 98,474 pages of additional documents, in accordance with Ms. Peters' requests and the Court's discovery orders." 525 F.Supp.2d at 499. On Monday morning, April 16th, defendants' counsel "informed the Court by email that Plaintiff voluntarily dismissed the case, accepted documents, and now refused to return them." 525 F.Supp.2d at 501. During a conference call later that day, the Court "ordered Dorsey to return the documents that Defendants had produced into the Court's custody and to do so within 24 hours." 525 F.Supp.2d at 502. Nine days later, on April 24th, all of the documents had still not been delivered to the Court. That day the Court sent an email to Ms. Peters, among others, stating that " 'The Judge would like to remind the parties … ' that [the Court's] April 16 verbal order 'ordered discovery returned to the court,' 'with the intention that the parties would not utilize such discovery....' " 525 F.Supp.2d at 516. The email directed Ms. Peters to " 'represent to the Court whether [her] firm currently possesses, or has possessed since Friday, April 20, any copies (in any format) of any transcripts of any depositions taken in this action' " and

" 'to return any such copies to this Court by 11 A.M. tomorrow. . . .' " *Id.*

It was against this background that Ms. Peters gave the direction to a young associate that constitutes one of the charges against her. The lawyer in question, Jordan Brackett, was a first year associate at Dorsey working on the matter with Ms. Peters. When Mr. Brackett learned of the Court's April 24th email, he "immediately reviewed the transcripts in his office and realized that several of the transcripts he previously thought were 'work product' were in fact unmarked" and therefore should be delivered to the Court. 525 F.Supp.2d at 518. He "called Ms. Peters and told her that he still had transcripts, some of which were unmarked." *Id.* Mr. Brackett had his copies of these transcripts delivered to Ms. Peters' office on April 25th. 525 F.Supp.2d at 520.

The next day, on April 26th, Ms. Peters and Dorsey partner Jonathan Herman "discussed the issue of returning transcripts to the Court, and that some of [the] transcripts may have been work product." *Id.* at 521. Mr. Herman, and others at Dorsey, directed Ms. Peters to comply with the Court's order by delivering *all* of the transcripts to the Court. *Id.*; *see also id.* n. 275. Ms. Peters challenged this direction. Mr. Herman told Ms. Peters to contact Dorsey's ethics specialist Bill Wernz or Dorsey's chief administrative partner Tom Tinkham. Ms. Peters did contact Tinkham and he told Herman that he gave Ms. Peters the same advice, i.e., to return the transcripts to the court. *Id.* n. 275; *see also,* Tr. 9/12/2007 at 346:11–17, 347:15–18.

Ms. Peters then asked Mr. Brackett to return to her office so they could review the transcripts he had had delivered to her. 525 F.Supp.2d at 521. Mr. Brackett testified that at this meeting Ms. Peters told him to mark up transcripts so that they would be work product and therefore could be withheld from the Court. According to Brackett:

> I first showed [Ms. Peters] the transcripts that had some type of marking and which I thought were likely attorney work product. I then showed her the other transcripts and flipped through them to demonstrate that they had no markings. Ms. Peters then instructed me to write on the unmarked transcripts so that they would be considered attorney work product, and so that we would not have to return them to the Court. To the best of my recollection, Ms. Peters said something to the effect of 'scribble all over them.' Ms. Peters then told me that she would leave her office so that I could write all over the transcripts without her being present. To the best of my recollection, she said that she would leave for a few minutes—either to powder her nose or to get something to drink. Ms. Peters then left the office. I was shocked by Ms. Peters' statement, but I understood that Ms. Peters was instructing me to do what she said and that she was not joking.

Brackett Decl. at ¶¶ 28–31 [4]; *see also,* 525 F.Supp.2d at 521.

Mr. Brackett promptly reported the incident to Dorsey management, who conducted an inquiry the same day. Richard Silberberg (a member of Dorsey's management committee and chair of its advocacy practice), Zachary Carter (head of Dorsey's trial group for the New York office),

---

4. In accordance with Judge Baer's practice, Mr. Brackett's direct testimony was presented in the form of a sworn Declaration, dated September 9, 2007. He was cross-examined at the Sanctions Motion hearing on September 11, 2007.

and Robert Dwyer (the head of the firm's New York office) interviewed Mr. Brackett and Ms. Peters separately. During his interview, Mr. Brackett said that "he had had a conversation with Ms. Peters [earlier that day] in which he believed that she had communicated to him a direction to alter transcripts to make them appear that they were work product privilege." Tr. 9/11/2007 at 58:4–14. At the close of the meeting, Mr. Silberberg told Ms. Peters "that what she said to Mr. Brackett, even if one were to assume it was a joke, was highly improper and unacceptable." Tr. 9/4/2007 at 95:5–7. As the district court noted, "[a] subsequent Dorsey internal investigation into various allegations by Ms. Peters concluded that 'it appears beyond question that Mr. Brackett actually believed Ms. Peters suggested to him that he mark up the transcripts so that they appeared to be work product and would not have to be returned to the court. It is indisputable that such a suggestion made by a partner to an associate is alarming and unethical.' " 525 F.Supp.2d at 522 n. 278.

Testifying before the district court, Ms. Peters did not deny that such a conversation took place but referred to the situation as a "joke" and said that she "recalled saying to Brackett, 'Well hell, if Zach [Carter] said it's work product, let's make it work product.' " 525 F.Supp.2d at 521 n. 276; see also Tr. 9/11/2007 at 219:4–12. In her submission to the Committee, Ms. Peters also did not deny that she made such statements but she claimed that whatever she said to Mr. Brackett was facetious (Peters Decl. dated Feb. 27, 2008 at ¶¶ 77, 96) or sarcastic (Peters Decl. at ¶¶ 96, 116). We find such assertions highly unlikely on their face; but, even if respondent subjectively believed her statements to be a "joke," the statements were made in a context in which there was a high likelihood that they would be taken seriously by

a young associate, and this, at a minimum, evidences a reckless disregard of the prohibitions of the New York Disciplinary Code.

Ms. Peters has also claimed that she was denied due process because (i) she only learned that the Brackett "allegation would be a subject of the hearing few days [sic] before he testified" (Peters Memo. at 17–18, citing Peters Decl. at ¶ 89) and (ii) that she "was only provided with fifteen minutes to cross-examine Mr. Brackett." Peters Memo at 18. Our review of the record, however, convinces us that Ms. Peters and her counsel had ample opportunity to challenge Mr. Brackett's version of these events.

Ms. Peters' cross-examination of Mr. Bracket spans 19 pages of the transcript. See Tr. 9/12/2007 at 399–418. One of Ms. Peters' lawyers, Michael Ross, was in the courtroom throughout. With regard to the length of time permitted for the cross-examination, the district court noted, "Regarding Brackett's recounting of this incident, at the hearing, Brackett's counsel on direct simply confirmed that Brackett's Declaration was true and accurate, thus providing Ms. Peters with additional time to cross-examine Brackett on any issues." Tr. 9/12/2007 at 399:1–12. Ms. Peters "chose not to directly cross-examine Brackett about the incident of Thursday, April 26th." 525 F.Supp.2d at 521 n. 277. For these and other reasons evident from the record, we find no fault in the procedures utilized with respect to Brackett's testimony and cross-examination.

Independently of the above, we also, as noted, accord substantial weight to Judge Baer's own credibility findings on this issue. At the close of Mr. Brackett's testimony, the following colloquy took place:

> Court: There was a lot of conversation about whether that was said in

jest. What is your view about whether she was saying it in jest?

[Mr. Brackett]: It was absolutely not in jest.

(Tr. 9/12/2007 at 419:2–5).

On this record Judge Baer concluded that respondent falsely stated that she was " 'joking' " when she "ordered a junior associate to alter transcripts that had been ordered returned to the Court by 'scribbling all over them' so that the transcripts might be considered 'work product' and thus arguably not returnable" to the Court. 525 F.Supp.2d at 549–50; *see also* 525 F.Supp.2d at 521–22. Judge Baer further stated:

> From the evidence, it is clear that Ms. Peters ordered a junior associate to alter transcripts that had been ordered returned to this Court by 'scribbling all over them,' so that the transcripts might be considered 'work product' and thus arguably not returnable. Nonetheless, Ms. Peters, after her direction to the associate concocted a *post hac* explanation that she was 'joking' when she gave that order. The evidence supports the clear finding that she was not. That representation was false. More to the point, Ms. Peters' order to an associate to alter evidence that a Court ordered returned is disturbing to say the least. It evinces a blatant disregard for court orders, and a willingness to take any action necessary towards the desired end, including ordering subordinates to commit misdeeds that, apparently, she felt uncomfortable committing herself.

525 F.Supp.2d at 549–550.

As to the breach of the confidentiality order, on April 12, 2007 Judge Baer, noting that "[p]rotective orders that limit access to certain documents to counsel and experts only are commonly entered in litigation involving trade secrets," entered a "Confidentiality Stipulation and Protective Order" (the "Confidentiality Order"). It provided, "*inter alia,* as noted at length in [the Court's] Opinion of May 23, 2007, that protected materials shall not be used in 'any other litigation proceeding.' *See generally Wolters Kluwer Fin. Servs. v. Scivantage,* 2007 WL 1498114, 2007 Dist. LEXIS 37306 (S.D.N.Y. Mar. [sic] 23, 2007)." 525 F.Supp.2d at 480 (footnote omitted).

Materials protected by the Confidentiality Order included "any copies, abstracts, summaries, or information derived from" discovery materials. CO at ¶ 2(h). The terms on use are crystal clear. The Confidentiality Order says several times that protected material shall not be used *in any litigation other than the captioned proceeding. See, e.g.,* CO at ¶ 7(a) (Protected Material "shall be used only for the purpose of the prosecution or defense of this action ... [and] shall not be used ... in any other litigation proceeding"); CO at ¶ 4(b) (Protected Materials "shall be used solely for purposes of the prosecution and defense of the above-entitled litigation...."); CO at ¶ 4(c) (Protected Materials "shall be used solely for purposes of the prosecution and defense of the above-entitled litigation....")

The Confidentiality Order provided a mechanism for challenging the designation of materials as confidential. *See* CO at ¶ 8. It also provided that "[t]he obligations created by [the] Order shall survive the termination of this lawsuit unless otherwise modified by the respective Court in each action" CO at ¶ 13.[5]

Ms. Peters does not deny that she used materials protected by the Confidentiality

---

**5.** The scope of the Confidentiality Order is also discussed in *Wolters Kluwer II.*

Order in the Massachusetts action. As she says in the Peters Decl. at ¶ 37: "In connection with the Motion for Preservation of Evidence filed in Massachusetts, we filed as an exhibit a Reply Brief that had, as an exhibit, excerpts of transcript pages...." *See also* 9/12 Tr. 366:4–7 (Ms. Peters "attached a copy of the reply papers from a form motion to the Massachusetts filing and that that set of reply papers had excerpts from the transcripts"); Peters Memo. at 7, 9–11.

Ms. Peters argues, however, that her use of the transcripts in the Massachusetts litigation was proper because Judge Baer had permitted the parties "to keep" such excerpts. Peters Decl. ¶ 37. Peters Memo. at 9–10. This is, frankly, preposterous on its face.[6] She argues further that her "good faith" is demonstrated by her request that an associate research whether the Massachusetts litigation was the same litigation within the meaning of the Confidentiality Order. *See* Peters Memo. at 10. But this can hardly be considered evidence of genuine good faith when the Confidentiality Order itself provided a mechanism for seeking guidance from the Court on its scope. *See* Confidentiality Order at ¶¶ 9, 10, 13. Ms. Peters' good faith claim is further belied by the fact that her own client did not agree with her use of the transcripts in the Massachusetts action. *See* 525 F.Supp.2d at 514 n. 254 ("Wolters Kluwer did not sign off on Peters' using the transcripts in MA without getting permission [from the court] first and of course that never happened.").

In reprimanding Ms. Peters for the use of transcripts in the Massachusetts action, Judge Baer wrote:

Ms. Peters used the transcripts [in the Massachusetts action] in a bad-faith effort for the improper purpose of gaining advantage (and expedient relief) in a new court after she had 'judge-shopped,' and after she had gained extensive discovery without providing any discovery of her own, and in an effort to have that Court eviscerate the Confidentiality Order that this Court had entered to govern discovery produced in this litigation (which remained in force after this litigation).

525 F.Supp.2d at 548; *see also, Wolters Kluwer II.*

We agree.

New York DR 1–102(a)(5) prohibits conduct prejudicial to the administration of justice. Disciplinary Rule 1–102(A)(4) prohibits a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. DR 7–106(A) declares that "[a] lawyer shall not disregard or advise the client to disregard a ... ruling of a tribunal made in the course of a proceeding." Offering guidance on DR 7–106(A), New York Ethical Consideration ("EC") 7–22 provides that "[r]espect for judicial rulings is essential to the proper administration of justice." EC 7–25 states further that:

> Rules of evidence and procedure are designed to lead to just decisions and are part of the framework of the law. Thus while a lawyer may take steps in good faith and within the framework of the law to test the validity of rules, the lawyer is not justified in consciously violating such rules and should be diligent in his or her efforts to guard against unintentional violation of them.

---

6. Ms. Peters' convoluted explanation to the district court is described at 525 F.Supp.2d at 519, 519 n. 269. After setting out these facts in detail, the Court observed that this was "just one more effort in a saga of obfuscation perpetrated by [Ms. Peters]...."

Ms. Peters clearly violated at least these three disciplinary rules. *See, e.g., In re Hausch,* 36 A.D.3d 141, 143, 145, 825 N.Y.S.2d 109 (2d Dep't 2006) (by "failing to timely comply with one or more court directions," Hausch violated DR 1–102(a)(5); by "disregarding and/or advising her client to disregard a ruling of a tribunal made in the course of a proceeding" Hausch violated DR 7–106(a)); *In re Goll,* 27 A.D.3d 131, 133, 807 N.Y.S.2d 137 (2d Dep't 2006) (by failing to produce a proposed judgment and necessary supporting documentation after being ordered to do so by the court, Goll violated DR 1–102(a)(5) and DR 7–106(a)); *In re Hirsch,* 231 A.D.2d 358, 360, 661 N.Y.S.2d 233 (2d Dep't 1997) ("[b]y failing to comply with … discovery demands and court orders," Hirsch violated DR 1–102(a)(5)); *see also, In re Stuart,* 22 A.D.3d 131, 803 N.Y.S.2d 577 (2d Dep't 2005) (lawyer violated DR 1–102(a)(4), (5) and (7) when, in response to a justice's question about the whereabouts of a witness, the lawyer falsely indicated that he had no knowledge of her whereabouts); *In re Hock,* 274 A.D.2d 130, 131, 711 N.Y.S.2d 803 (4th Dep't 2000) (lawyer violated DR 1–102(a)(4) and (7) and DR 7–102(a)(5) when he "submitted a false expert disclosure statement and made false statements to the trial court and to defense counsel with regard to the availability and prospective testimony of the expert witness"); *In re Bridge,* 196 A.D.2d 43, 44, 607 N.Y.S.2d 997 (4th Dep't 1994) (lawyer violated DR 1–102(a)(4) while representing a client in a criminal appeal when he "misrepresented to [the][c]ourt on two successive applications for a stay of execution of the sentence that he had ordered the trial transcript and that [it] was being prepared" when in fact he had "failed to take the necessary steps to obtain the trial transcript in a timely fashion").

Accordingly, for the reasons set forth above, respondent is hereby suspended from practicing in the Southern District of New York pending the outcome of these proceedings and until further order of this Court.

SO ORDERED.